

# Sponsorship Agreement

**1. Agreement.** This Sponsorship Agreement ("Agreement"), effective as of December 16, 2021 ("Effective Date"), is entered into between Professional Fighters League, LLC, a Delaware limited liability company with offices at 320 West 37th Street, 14th Floor, New York, NY 10018 ("PFL"), and Takeover Industries, Inc., a Nevada Corporation with offices at 401 Ryland Street Suite 200-A Reno, NV 89502 USA ("NL" or "SPONSOR"), (each a "Party" and together the "Parties"). For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree:

**2. Benefits.** PFL shall provide the promotional and sponsorship benefits (collectively, "Benefits") as outlined in **Exhibit B**, for the duration of the Term.

**3. Term.** Unless terminated earlier pursuant to Section 7 of Exhibit A, the term of this Agreement shall begin upon the Effective Date and shall continue in effect until December 31, 2024 (the "Initial Term"). SPONSOR may elect to renew this sponsorship and extend the Agreement to December 31, 2025 (the "Renewal Term" and together with the Initial Term, the "Term"), provided that SPONSOR provides written notice to PFL of its election by November 1, 2024.

**4. Territory.** Worldwide.

**5. Fees and Payment.**

(a) SPONSOR shall pay PFL a sponsorship and marketing fee (the "Fee"), in U.S. dollars, in consideration of the Benefits, as follows:

| Paid By:   | 2022      | 2023      | 2024      | 2025 (if renewed) |
|------------|-----------|-----------|-----------|-------------------|
| January 1  | $108,500  | $178,750  | $196,750  | $216,425          |
| April 1    | $136,500  | $178,750  | $196,750  | $216,425          |
| July 1     | $162,500  | $178,750  | $196,750  | $216,425          |
| October 1  | $162,500  | $178,750  | $196,750  | $216,425          |
| November 1 | $80,000   |           |           |                   |

**6. Exhibits.** The Parties have read and agree to be bound by the Terms and Conditions attached hereto as **Exhibit A**, the Benefits described on and attached hereto as **Exhibit B**, each of which is incorporated by reference in this Agreement as if fully set forth herein.

[*Signature page follows*]



IN WITNESS WHEREOF, PFL and SPONSOR have executed this Agreement intending to be bound hereby as of the Effective Date.

**TAKEOVER INDUSTRIES, INC.**

| | |
|---|---|
| By: | *[signature]* |
| Name: | Toby McBride |
| Title: | CEO |
| Email: | Toby@takeoverind.com |

| | |
|---|---|
| By: | *[signature: Jason Tucker]* |
| Name: | Jason Tucker |
| Title: | President |
| Email: | Jason@takeoverind.com |

**PROFESSIONAL FIGHTERS LEAGUE, LLC**

| | |
|---|---|
| By: | *[signature: Jon Tuck]* |
| Name: | Jon Tuck |
| Title: | Chief Revenue Officer |
| Email: | jtuck@pflmma.com |



# EXHIBIT A
# TERMS AND CONDITIONS

1. **Late Payment of Fee.** In the event the Fee ("Payment") is not received on or before the applicable payment due date listed in the "Fee" Section above, the PFL may consider such failure to pay the Payment in a timely manner a material breach, and may elect to charge Sponsor a late fee of one and one-half percent (1.5%) per month (or the highest amount permitted by law, if lower) of the payment then due and owing until it is paid in full. Sponsor acknowledges and agrees that any such election of remedies by PFL does not waive any other remedies available to the PFL for breach of contract or otherwise.

2. **Costs**. Except as otherwise specifically provided in this Agreement, each of the Parties shall pay its own expenses of performing this Agreement, which for Sponsor shall include all design, production and other costs associated with the preparation, delivery, installation, activation, removal and/or destruction of the elements necessary to utilize the Benefits (including any changes or updates thereto during the Term).

3. **Licenses.**
   a. **From PFL.** PFL grants a limited license for SPONSOR, with a pass through right to its affiliates, official resellers, retailers, distributors and licensees, successors and assigns to use and distribute the PFL logos and content provided by PFL ("PFL IP"), subject to PFL approval. All PFL IP will be owned exclusively by PFL and shall be used only in accordance with PFL guidelines and policies communicated to SPONSOR. The goodwill from all uses of PFL IP will inure to the benefit of PFL.
   b. **From SPONSOR**. SPONSOR grants a limited license for PFL to use and distribute the SPONSOR logos and content provided by SPONSOR ("SPONSOR IP"), subject to SPONSOR approval. All SPONSOR IP will be owned exclusively by SPONSOR and shall be used only in accordance with SPONSOR guidelines and policies communicated to PFL. The goodwill from all uses of SPONSOR IP will inure to the benefit of SPONSOR.

4. **Non-exclusivity.** Except as otherwise expressly provided herein and in Exhibit B, Sponsor's rights to receive the Benefits are non-exclusive and the PFL shall be free to grant similar and/or identical rights to any third party.

5. **Venue / Broadcast Policies.** Sponsor and the PFL agree that this Agreement, including with respect to any Benefits, shall be performed in accordance with the rules and policies of the PFL venues and broadcasters as may be applicable to this Agreement, if any, which have been provided to SPONSOR in writing.

6. **Confidential Information.** Each Party (a "Discloser") may furnish the other (a "Recipient") with Confidential Information (as defined below) solely as is necessary to enable PFL to deliver the Benefits and otherwise carry out the purposes of this Agreement. Each Party agrees to keep confidential, and will not use the other Party's Confidential Information, for any other purposes other than in connection with performance of this Agreement. As used herein, the term "Confidential Information" shall mean all non-public information (whether written, oral or in another medium) provided by a Party to the other Party in connection with this Agreement. The terms and conditions of this Agreement are Confidential Information of both Parties. Each Party shall use at least the same degree of care in protecting the other Party's Confidential Information

Case 1:24-cv-01335-GS   Document 16-1   Filed 05/13/24   Page 4 of 12



as it uses in protecting its own confidential information, but not less than reasonable care. Each Party recognizes that irreparable harm would be caused that is not capable of being compensated with money damages if Confidential Information were used or disclosed in violation of this Agreement and in such event and in addition to any other right or remedy available, a Party shall have the right to equitable relief without the need to secure bonding in order to protect its Confidential Information.

Recipient shall not disclose, or allow access to, any Confidential Information to anyone except employees, Recipients and consultants of Recipient who have a need to know Confidential Information to further the transactions contemplated by this Agreement and are bound by obligations to keep such information confidential and use it solely for purposes of this Agreement. Recipient shall be liable for any act or omission by anyone to whom it has disclosed Confidential Information that would violate the terms of this Agreement if done by Recipient.

The requirements of this Section 6 shall not apply to information, other than Deliverables, that Recipient can demonstrate by competent evidence (i) was lawfully known by Recipient prior to receiving it from Discloser; (ii) was developed by Recipient independently without use of or reference to Confidential Information; (iii) was lawfully obtained by Recipient from a third party without obligation of confidentiality; or (iv) is or subsequently becomes publicly available other than through the fault or negligence of Recipient.  Recipient may disclose Confidential Information to comply with applicable law or a valid court or governmental order, provided that Recipient promptly provides written notice to Discloser to enable Discloser to protect such Confidential Information, discloses only such Confidential Information as is legally required to be disclosed, and uses reasonable efforts to ensure that confidential treatment is accorded to such Confidential Information.

Notwithstanding anything to the contrary herein, the obligations in this Section 6 to protect Confidential Information shall survive any termination of this Agreement.

7. **Termination.**  This Agreement shall terminate at the end of the Term, unless terminated earlier pursuant to this Section 7.

   a. If either Party is in material breach of this Agreement, the non-breaching Party may terminate this Agreement upon written notice to the other Party, provided such breach has not been cured within thirty (30) days following written notice to the breaching Party of such breach (or sooner if exigencies so reasonably require). In the event of early termination, SPONSOR shall pay to PFL for services properly rendered and/or Benefits properly delivered up to the effective date of termination ("Termination Sum"). In the event the amounts paid to PFL exceed the Termination Sum, PFL shall refund the difference to SPONSOR within ten (10) days.

   b. Either Party may terminate this Agreement at any time by giving written notice to the other Party should the other Party file a petition of any type as to its bankruptcy, have a petition of any type as to its bankruptcy be filed by a creditor if the resulting bankruptcy case is not dismissed within ninety (90) days of filing, become insolvent, or make an assignment for the benefit of creditors, or if any significant portion of its business or assets become subject to receivership.

8. **Modification, Substitution or Elimination of Benefits.** The PFL may be prohibited, limited, or otherwise restricted from providing a Benefit under the terms of any agreement as a result of limitations due to the PFL fight venues or broadcasters of PFL fights, due to an event of Force



Majeure (as defined below), or because such Benefit becomes impossible or impracticable for the PFL to provide.  In the event that the PFL is not able to provide a Benefit for the reasons listed above, the PFL shall not be deemed to be in breach of this Agreement.  If PFL becomes aware that such an event is likely to delay or prevent punctual performance of its obligations, PFL will promptly notify SPONSOR in writing and use its best efforts to avoid or remove such causes of nonperformance and to complete delayed performance whenever such causes are removed. If doing so in a timely manner is impracticable, PFL will in good faith substitute a mutually agreeable Benefit of the same or substantially equivalent type and equivalent promotional value for any Benefit that the PFL did not provide (which such Benefit may be provided during a subsequent year or for alternative events which have been approved by SPONSOR, such approval not to be unreasonably withheld, if applicable, even if such replacement benefits are provided by PFL past the end of the Term) or provide a refund of a pro-rata portion of the Fee associated with such Benefit which is not received.

9. **Reversion of Rights.** Upon termination of this Agreement for any reason set forth in this Agreement, all rights and privileges granted to SPONSOR hereunder shall automatically revert to the PFL, and all rights and privileges granted to the PFL shall automatically revert to SPONSOR.

10. **Force Majeure.** No Party shall be liable for failure or other delay in performance of its obligations under this Agreement and such failure or delay shall not constitute a breach under this Agreement to the extent such failure or delay is due to circumstances beyond its reasonable control, including acts of God (fires, floods, storms, hurricanes, earthquakes, tornadoes, etc.), acts of public enemy, war, civil disturbance, sabotage, accidents, pandemic, epidemic, public health crisis, quarantine, insurrections, blockades, embargoes, acts of any governmental or quasi-governmental authority, labor strikes, lock outs or other labor disturbance or interruption or any similar force majeure event or occurrence which in the good faith and reasonable opinion of the PFL renders the PFL or any portion of any PFL event impracticable (a "<u>Force Majeure Event</u>").  In the event a Force Majeure Event causes the unavailability of any Benefits during the Term, the provisions of Section 8 will apply.

11. **Independent Contractor Relationship**.  The relationship created by this Agreement is that of an independent contractor and neither PFL nor SPONSOR are joint venturers, partners, employees or agents of each other.  Neither party shall bind the other to any agreement without the express written consent of the other.

12. **Warranty and Disclaimers**.  Each Party warrants and represents to the other that (a) it has the full power and authority to enter into this Agreement and fully perform all of its obligations and grant all necessary rights hereunder without violating the legal or equitable rights of any third party; (b) none of the acts, services or materials provided or created shall violate or will violate or infringe upon the rights of any third party, or contain any material that is obscene, defamatory, libelous, slanderous or injurious to the user; (c) in the case of PFL, that the provision of Benefits will be of a professional nature, performed by individuals with skills necessary to carry out such services; (d) in the case of PFL, that it shall contractually require Athletes to perform the Benefits and Services as further described in Exhibit "B"; (e) in the case of SPONSOR, that any products manufactured, marketed or sold in connection with any PFL branding have been manufactured, marketed, and sold in accordance with all required licenses, permits, and approvals, and will not violate any applicable law or regulation; and (f) all Benefits, Products and Services, and materials provided hereunder are in compliance with all applicable federal, state and local laws and regulations.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE PARTIES



MAKE NO OTHER WARRANTIES HEREUNDER AND EXPRESSLY DISCLAIM ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

**13. Indemnification; Limitation of Liability.**

a.  Each Party shall indemnify, defend and hold harmless the other and their respective officers, directors, shareholders, agents, representatives, employees and affiliates ("Related Parties") from and against all third party claims, demands, causes of action, judgments, costs and expenses, including reasonable and actual outside attorneys' fees, of whatsoever nature (in the aggregate, "Claims"), arising from or relating to (i) the negligent actions performed by or omissions of a Party or any of the Party's agents, employees or subcontractors incident to or under this Agreement, (ii) a breach of any of the material obligations, representations, and warranties under this Agreement by a Party or any of its agents, employees or subcontractors; or (iii) any failure of a Party or its agents, employees or subcontractors to comply with all applicable laws in connection with performance under this Agreement. SPONSOR will also indemnify PFL and its Related Parties in connection with any product liability or false advertising Claims related to the manufacturing, marketing, and sale of any SPONSOR products. The indemnified Party shall give prompt written notice to the indemnifying Party of any Claims.  The indemnifying Party shall control the defense of the Claim with counsel of its choosing and approved by the indemnified Party, such approval not to be unreasonably withheld, delayed or conditioned.  The indemnified Party may participate in the defense at its own cost with its own counsel.  The indemnified Party shall cooperate with the indemnifying Party in providing documents, information, materials, and reasonable assistance, all at the indemnifying Party's cost.  The indemnifying Party shall not settle any Claim without the written consent of the indemnified Party, such consent not to be unreasonably withheld, delayed or conditioned, unless the indemnified Party is completely released from the Claim and, if applicable, fully and without prejudice removed from the case underlying the Claim.

b.  IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, PUNITIVE OR SPECIAL DAMAGES (INCLUDING BUT NOT LIMITED TO DAMAGES TO BUSINESS REPUTATION, LOST BUSINESS, OR LOST PROFITS), WHETHER FORESEEABLE OR NOT AND HOWEVER CAUSED, EVEN IF SUCH PARTY IS ADVISED OF THE POSSIBILITY THAT SUCH DAMAGES MIGHT ARISE.

c.   EXCEPT FOR A PARTY'S INDEMNIFICATION OBLIGATIONS OR ANY BREACH OF CONFIDENTIALITY, EACH PARTY'S MAXIMUM AGGREGATE LIABILITY UNDER OR IN RELATION TO THIS AGREEMENT, INCLUDING FOR ANY BREACH OF CONTRACT, TORT OR OTHERWISE AS WELL AS ANY LIABILITY FOR ANY NEGLIGENT ACT OR OMISSION HOWEVER ARISING IN RESPECT TO ANY ONE OR MORE OCCURENCES OR INCIDENTS DURING THE TERM SHALL BE LIMITED TO THE AMOUNT OF THE FEE ACTUALLY PAID BY SPONSOR TO PFL FOR THE YEAR OF THE TERM DURING WHICH THE CLAIM AROSE.

d.   Notwithstanding the foregoing limitations on liability nothing shall limit the liability of either Party for acts of fraud or willful misrepresentation.

**14. Waiver.**  Either Party may waive compliance by the other Party with any covenants or conditions contained in this Agreement, but only by written instrument signed by the Party waiving



such compliance. No such waiver, however, shall be deemed to waive any other circumstance or any other covenant or condition not expressly named in the written waiver.

15. **Successors and Assigns.** This Agreement will be binding upon and will inure to the benefit of the Parties hereto and their respective heirs, representatives, successors and permitted assignees. Each Party may assign or transfer this Agreement upon notice in connection with a merger, reorganization or sale of substantially all of the business to which the Agreement relates. Any other purported assignment or transfer by a Party without the other Party's prior written consent is void and without any legal effect.

16. **Choice of Law.** This Agreement is governed by and construed in accordance with the internal substantive laws of the State of New York without regard to its conflicts of law rules. Any dispute under this Agreement shall be brought exclusively in the federal or state courts in the State of New York, and each Party consents to the jurisdiction and venue of such courts.

17. **Notices.** All notices to be provided hereunder shall be in writing and shall be deemed delivered at the time of receipt if delivered by hand with receipt confirmed by the recipient, or, if mailed pre-paid by registered or certified mail, return receipt requested, three (3) days after deposit with the U.S. Postal Service, or, if by nationally recognized express courier (such as FedEx or UPS), upon receipt. Notices to PFL and SPONSOR shall be addressed to the addresses provided below, or to such other address as either Party shall designate in writing to the other from time to time by one of the notice methods hereunder.

<u>To SPONSOR</u>: c/o Karish & Bjogum 119 E. Union St., Suite B Pasadena, CA 91103

<u>To PFL</u>: 320 37th Street, 14th Floor, New York, NY 10018 Attention: General Counsel, email: legal@pflmma.com

Requests for approvals and related responses as well as other routine business communications between the parties may be exchanged by electronic mail.

18. **Complete Agreement.** This Agreement, including all Exhibits, sets forth the entire understanding of SPONSOR and PFL with respect to the subject matter hereof and supersedes all prior and contemporaneous letters of intent, agreements, covenants, arrangements, communications, representations, or warranties, whether oral or written, by any officer, employee, or representative of either Party relating thereto.

19. **Amendments.** This Agreement may only be amended in a writing specifically referencing and amending this Agreement, signed by authorized representatives of both Parties.

20. **Survival**. The provisions of Sections 1, 6, and 11 through 20, in addition to any other provisions of this Agreement that are clearly intended to survive termination, shall survive termination of this Agreement for any reason.

[*End of Exhibit A*]



# EXHIBIT B
## SPONSORSHIP BENEFITS

Subject to the terms of the Agreement, **PFL** will provide the sponsorship and marketing Benefits set forth below for each year during the Term, except as otherwise specified. Unless otherwise specified, all capitalized terms used in this **Exhibit B** will have the meanings ascribed to them in the Agreement.

1. **EXCLUSIVE CATEGORY**

    a. NL shall have sponsorship exclusivity in the category of "Water" for PFL League Seasons (annual Regular Season, Playoffs and Championship events), PFL Challenger Series, and the PFL Combine during the Term. NL understands that PFL may not be able to enforce category exclusivity through PFL official broadcast distributors outside the US (and its territories).

2. **TRADEMARK RIGHTS & OFFICIAL DESIGNATIONS**

    a. Use of "PFL Official Partner" marks and approved imagery across all marketing platforms.

    b. Official Designations: "Official Water of the PFL" and/or other mutually agreed upon designations. All designations apply to the PFL League Seasons, PFL Combine & PFL Challenger Series.

    c. "Pass-Thru Marketing Rights": NL may extend co-branded PFL-themed marketing programs to mutually agreed third party partners, i.e., distributors of NL retailers, subject to PFL prior approval (email sufficing).

    d. As an addition to Pass-Thru Marketing Rights and in an effort to assist NL in driving incremental and new retail distribution, the PFL will allow NL to "tag" retailers in all marketing assets, subject to space, availability, and PFL prior approval of all retailers (email sufficing) including:

        i. Visible Cage Branding

        ii. :30 commercial units

        iii. Digital & Social Assets (as applicable)

    e. All uses of PFL branding shall be in accordance with PFL brand and style guidelines and subject to PFL prior approval (email sufficing).

    f. PFL will provide through a Dropbox on a regular basis, and grants NL the right to use, certain PFL photographs, images, videos, films, drawings and/or renderings ("PFL Content") that include branding for promotional use by NL via its website, all social media channels (including targeted ads), and for print and TV promotion. In the event that NL wants to use PFL Content that is not provided by PFL, NL may notify via electronic mail of the content that they are requesting to use, and PFL shall give



written authority, in PFL's sole discretion, on the use of the content by NL, not to be unreasonably withheld. "Regular basis" means, generally, at least at the end of the first half of the Regular Season, the second half of the Regular Season, the Playoffs and the Championship.

3. **SPONSORSHIP RIGHTS AND BENEFITS**

    a. PFL LEAGUE SEASON

        i. The PFL League Season shall consist of at least ten (10) live events per calendar year.

        ii. ON-SITE INTEGRATION

            1. NL brand integration in all step-and-repeat signage for media backdrops, press conferences, weigh-ins, fighter interviews, etc. on-site at PFL League Season live events

            2. NL promotional space for installation of a promotional booth at each PFL League Season live event (where available and with direct cost of staffing and construction of booth and collateral to be borne exclusively by NL)

            3. LED Ribbon signage (where available) at each PFL League Season event featuring the NL brand and, if available, dynamic messaging and/or imagery

        iii. VISIBLE CAGE BRANDING

            1. NL to receive one (1) canvas logo placement (cage floor mat) per PFL League Season live event

            2. NL to receive one (1) interior and exterior vertical logo placement per PFL League Season live event

            3. NL to receive one (1) interior and exterior horizontal logo placement per PFL League Season live event

            4. NL product to be made available to PFL athletes for use during, before & after each PFL League Season live event (where permitted and provided that NL product has been provided by NL to PFL at NL's cost)

        iv. BROADCAST INTEGRATION

            1. NL cans to be strategically placed in fighters' locker rooms to be seen during live look-ins throughout each PFL League Season live event telecast or livestream (where permitted and provided that NL cans have been provided by NL to PFL at NL's cost)



2. NL to receive two (2) :30 commercial units in all PFL League Season live event telecasts or livestreams plus re-airs

3. NL to receive rotational LED signage in all PFL League Season live events

b. GLOBAL PR

i. PFL will provide to NL a strategic publicity plan designed to reach target markets as indicated by NL, which may include but are not limited to key markets, the investor community, the beverage/retail category, business/mainstream media and endemic MMA outlets.

ii. PFL and NL will release a mutually approved press announcement on a mutually agreed date in a mutually agreed upon manner.

c. PFL ATHLETE BRAND AMBASSADOR PROGRAM

i. The PFL will deliver two (2) high-profile PFL athletes to be brand ambassadors ("Brand Ambassadors") for NL.

ii. PFL to create and produce a custom :30 commercial unit for NL using Brand Ambassadors

iii. The PFL will work in conjunction with NL to mutually agree on defined roles & responsibilities for Brand Ambassadors, which may include but are not limited to:

1. Inclusion in custom video content & photos featuring NL products produced by PFL – One (1) custom four (4) hour production shoot per Brand Ambassador per calendar year

2. Social media support - Four (4) posts per Brand Ambassador per calendar year

3. Consumer-facing programs such as appearances and autograph signings

iv. In addition, as commercially reasonable and practicable, the PFL will capture and feature content in the event that other NL talent are made available to interact with PFL Brand Ambassadors

d. NL PRODUCT PLACEMENT

i. NL products pre-approved by PFL (where permitted and provided that NL products have been provided by NL to PFL at NL's cost) will be strategically placed for broadcast, fan, and general media visibility throughout the Term with the following placements throughout the PFL



League Season and the PFL Challenger Series:

1. PFL official press conference tables

2. Post-event interviews with PFL fighters

3. PFL ceremonial weigh-ins

4. PFL training spaces for organic social content capture and amplification

e. DIGITAL & SOCIAL ASSETS

   i. NL to receive two (2) monthly social media posts on PFL social media channels, as mutually agreed (email sufficing) with respect to the content and channels

   ii. All social media posts by PFL that include NL branding shall tag and mention the NL equivalent social media channels

   iii. PFL shall provide on a regular basis social media reports on activation including social media impressions across all PFL channels including YouTube, Instagram, Facebook, and Twitter, as well as viewership numbers from telecasts and livestreams of the PFL League Season, PFL Challenger Series and PFL Combine (to the extent available to PFL), and provide a screenshot of Sprout (or other similar platform) insights on impressions on all content in which NL is mentioned or tagged in by PFL. PFL shall assign one (1) employee or representative as a direct point of contact for NL in discussing and delivering these reports.

   iv. NL to receive a year-round campaign with a mutually agreed (email sufficing) number of impressions on PFLmma.com. Such campaign will consist of elements including banner ads, section skins, video pre-roll, and sponsor click-throughs.

   v. NL and PFL to mutually agree (email sufficing) on social activation strategies and will work collaboratively on such strategies in good faith.

   vi. PFL & NL will collaborate to create a custom content series throughout the year that will live digitally and socially, with a minimum of four (4) episodes

f. IN-BROADCAST FEATURES / SOCIAL MEDIA ACTIVATION

   i. One (1) in-broadcast feature ("Broadcast Feature") per PFL League Season live event, which will be a mutually agreed collaborative decision (email sufficing)

   ii. Broadcast Feature to be amplified across PFL digital and social channels



        with a minimum of one (1) post per PFL League Season live event

g. PFL COMBINE

   i. If executed by PFL, NL will be a "Presenting Sponsor" of the first ever MMA combine

      1. Includes prominent product placement, one (1) custom in-broadcast feature and one (1) :30 spot in broadcast

      2. Prominent NL signage throughout PFL Combine, as available and mutually agreed (email sufficing)

h. PFL CHALLENGER SERIES

   i. The PFL Challenger Series shall consist of at least eight (8) live events per calendar year.

   ii. NL will be a "Presenting Sponsor" of the first ever PFL Challenger Series

   iii. NL will receive prominent LED and/or other signage branding, as available and mutually agreed (email sufficing), for all eight (8) PFL Challenger Series live events ("CS Live Events")

   iv. NL will receive one (1) :30 commercial unit within all CS Live Events

   v. NL will receive prominent product placement throughout all CS Live Events including in the locker rooms (where permitted and provided that NL products have been provided by NL to PFL at NL's cost)

   vi. NL will receive the to-be-mutually-agreed (email sufficing) "NXT LVL" feature awarding fighters participating in CS Live Events contracts with the PFL, such contract awards and decisions to be made solely by PFL in PFL's sole discretion

i. HOSPITALITY

   i. As a PFL Official Partner, NL will receive six (6) VIP tickets & twenty (20) general admission tickets for each PFL League Season live event, where PFL admits a live ticketed audience to each such event

   ii. PFL shall provide NL with PFL's partner rate for host hotel rooms (subject to availability) per each PFL League Season live event, where PFL admits a live ticketed audience to each such event, provided NL gives one (1) month notice prior to any such event

[*End of Exhibit B*]