UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------X

PROFESSIONAL FIGHTERS LEAGUE,
LLC,

                   Plaintiff,

          - against -

TAKEOVER INDUSTRIES, INC. a/k/a
NXT LVL,

                 Defendant.

-------------------------------------------------------------------------------X

:
:
:
:
:
:
:
:
:
:
:
:
:
:

24 Civ. 1335 (GS)

**OPINION & ORDER**

**GARY STEIN, United States Magistrate Judge:**

Plaintiff Professional Fighters League, LLC ("PFL") brings this action for

breach of contract, alleging nonpayment of a sponsorship fee.  Defendant Takeover

Industries, Inc. ("TOI") moves to dismiss PFL's Second Amended Complaint ("SAC")

for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

(Dkt. No. 15).  For the reasons set forth below, TOI's motion to dismiss is **DENIED**.

## BACKGROUND

The facts below are taken from the SAC, which is the operative complaint in

this action (Dkt. No. 8), and the relevant contract between the parties—a

Sponsorship Agreement, effective as of December 16, 2021 (the "Agreement")—

which is included with TOI's motion papers (Dkt. No. 16-1).[1]  The SAC's factual

---

[1] Although the Sponsorship Agreement is not attached to the SAC, it is the basis for PFL's breach of
contract claim and is, therefore, deemed incorporated by reference and properly before the Court on
this motion to dismiss.  *See, e.g.*, *Verzani v. Costco Wholesale Corp.*, 641 F. Supp. 2d 291, 297-98
(S.D.N.Y. 2009) ("[W]here the claim is for breach of contract, the complaint is deemed to incorporate
the contract by reference because the contract is integral to the plaintiffs' claim.").

allegations are assumed to be true for purposes of this motion.  *See R.M. Bacon LLC*

*v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 509, 512 (2d Cir. 2002).

### A.  The Sponsorship Agreement

On or about December 16, 2021, PFL, a professional mixed martial arts

sports league, entered into the Agreement with TOI, a manufacturer of hydrogen

water and energy drinks sold under the "NXT LVL" brand.  (SAC ¶ 9; Dkt. No. 16-1

at 1-2; Dkt. No. 29 at 1-2).  TOI is referred to as the "SPONSOR" in the Agreement.

(Dkt. No. 16-1 at 1).

Under the Agreement, PFL agreed to provide promotional and sponsorship

benefits to TOI, as outlined in Exhibit B to the Agreement, during the term of the

contract.  (Dkt. No. 16-1 at 1).  As described in Exhibit B, NXT LVL was designated

the "Official Water of the PFL."  (*Id.* at 8).  TOI's sponsorship rights and benefits

included (among other things) signage at PFL media events; branding in fight

cages; a brand ambassador program featuring two high-profile PFL athletes;

product placement for broadcast, fan, and general media visibility; social media

posts; and in-broadcast features amplified across PFL's digital and social channels.

(*Id.* at 8-12).

In return, the Agreement required TOI to pay PFL a sponsorship and

marketing fee (the "Sponsorship Fee") over the three-year term of the Agreement.

(*Id.* at 1).  The fee was payable in four to five annual installments, according to a

schedule in the Agreement.  (*Id.*).  The contemplated payments totaled $650,000 in

2022, $715,000 in 2023, and $787,000 in 2024.  (*Id*.).  TOI also had an option to

renew the sponsorship and extend the Agreement for an additional year.  (*Id*.).

Exhibit A to the Agreement sets forth various other "Terms and Conditions"

to which the parties agreed to be bound.  (*Id*. at 1, 3-7).  Section 13 of the Terms and

Conditions includes clauses limiting the parties' liability.  Of primary relevance

here is Section 13.c, which provides as follows:

> EXCEPT FOR A PARTY'S INDEMNIFICATION OBLIGATIONS OR
> ANY BREACH OF CONFIDENTIALITY, EACH PARTY'S MAXIMUM
> AGGREGATE LIABILITY UNDER OR IN RELATION TO THIS
> AGREEMENT, INCLUDING FOR ANY BREACH OF CONTRACT,
> TORT OR OTHERWISE AS WELL AS ANY LIABILITY FOR ANY
> NEGLIGENT ACT OR OMISSION HOWEVER ARISING IN
> RESPECT TO ANY ONE OR MORE OCCURENCES OR INCIDENTS
> DURING THE TERM SHALL BE LIMITED TO THE AMOUNT OF
> THE FEE ACTUALLY PAID BY SPONSOR TO PFL FOR THE YEAR
> OF THE TERM DURING WHICH THE CLAIM AROSE.

(*Id*. at 6 (capital letters in original)).

## B.  PFL's Allegations

According to the SAC, TOI made its first installment payment under the

Agreement when due on January 1, 2022, in the amount of $108,500.  (SAC ¶ 12).

TOI then made only a partial payment of $100,000 towards its second installment

payment of $136,500 due on April 1, 2022.  (*Id*. ¶¶ 12, 18).  Thereafter, TOI failed to

make any further payments to PFL pursuant to the Agreement.  (*Id*. ¶ 13).

For its part, PFL performed all of its obligations under the Agreement.  (*Id*.

¶ 14).  Yet it never received the outstanding payments required from TOI, despite

due demand therefor.  (*Id*.).  On February 22, 2024, PFL commenced this action,

asserting (as does the SAC) a single cause of action against TOI for breach of

contract.  (Dkt. No. 1 ¶¶ 9-13; SAC ¶¶ 15-19).  PFL claims $1,353,250 in damages, which equals the payments due in 2022, 2023, and the first quarter of 2024, less the $208,500 in payments made by TOI.  (*Id.* ¶ 18; *see* Dkt. No. 16-1 at 1).  PFL also seeks monthly late fee charges of 1.5% pursuant to the Agreement.  (*Id.* ¶ 18; *see* Dkt. No. 16-1 at 3).

### C.  Procedural History

The SAC, filed on March 26, 2024, invokes federal diversity jurisdiction under 28 U.S.C. § 1332.  (SAC ¶¶ 1-5).  In the Agreement, both parties consented to the exclusive jurisdiction of the New York federal and state courts for disputes arising thereunder.  (Dkt. No. 16-1 at 7).  The parties have consented to my jurisdiction over this action for all purposes.  (Dkt. No. 24).

On May 13, 2024, TOI filed the instant motion to dismiss (Dkt. No. 15), together with a supporting memorandum of law (Dkt. No. 16 ("TOI Br.")).  TOI argues that the terms of the parties' Agreement—in particular, the limitation of liability in Section 13.c—"foreclose any additional recovery for damages related to a breach of contract."  (TOI Br. at 3).  Under that provision, according to TOI, PFL's "sole remedy is retention of monies previously paid."  (*Id.* at 7).  Accordingly, TOI seeks dismissal of the SAC under Rule 12(b)(6).

The deadline for PFL's opposition papers was extended while the parties engaged in settlement efforts, which ultimately proved unsuccessful.  (Dkt. Nos. 19, 27, 28).  PFL filed its opposition brief on September 16, 2024.  (Dkt. No. 29 ("PFL Br.")).  PFL argues that interpreting Section 13.c to bar its claim for damages

"would lead to an absurd and unreasonable result" that would "render other provisions of [the Agreement] superfluous," and "would effectively permit [TOI] to receive services from [PFL] gratis." (PFL Br. at 1). TOI did not file a reply brief.

**LEGAL STANDARDS**

**A. Motion to Dismiss under Rule 12(b)(6)**

Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 (complaint must raise "more than a sheer possibility that a defendant has acted unlawfully").

In considering a motion to dismiss under Rule 12(b)(6), the Court must "accept[] all factual allegations in the complaint as true" and "draw[] all reasonable inferences in the plaintiff's favor." *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (citation omitted). Courts need not, however, consider "conclusory allegations or legal conclusions couched as factual allegations." *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (citation omitted); *see also Iqbal*, 556

U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Determining whether a plausible claim has been pled is "a context-specific task" that requires the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *Herrera v. Comme des Garcons, Ltd.*, 84 F.4th 110, 113 (2d Cir. 2023).  However, "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Twombly*, 550 U.S. at 556. The court's task "is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of N.Y.*, 952 F.3d 67, 75 (2d Cir. 2020).

### B.  Principles of Contract Interpretation

"It is axiomatic under New York law[2] . . . that the fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (cleaned up).  "The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 114 (2d Cir. 2014) (cleaned up).  "The contract should be read as a whole, with every part interpreted with reference to the whole in order, *inter alia*, to give effect to its general purpose, to safeguard against adopting an interpretation that would render any individual provision superfluous, and to ensure that

---

2 The Agreement contains a New York choice of law clause, and both parties' briefs assume that New York law applies.  (Dkt. No. 16-1 at 7; TOI Br. at 4-6; PFL Br. at 4-7).

particular words and phrases do not receive undue emphasis." *Flynn v. McGraw*

*Hill LLC*, 120 F.4th 1157, 1165-66 (2d Cir. 2024) (cleaned up).

Under ordinary principles of contract construction, "a written agreement that

is complete, clear and unambiguous on its face must be enforced according to the

plain meaning of its terms." *Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A.*

*v. Navarro*, 25 N.Y.3d 485, 493, 15 N.Y.S.3d 277, 282, 36 N.E.3d 80, 85 (2015).  At

the same time, it is a "'well-settled principle that a contract should not be

interpreted to produce an absurd result, one that is commercially unreasonable, or

one that is contrary to the intent of the parties.'"  *Cambridge Cap. LLC v. Ruby Has*

*LLC*, 675 F. Supp. 3d 363, 390 (S.D.N.Y. 2023) (quoting *Cole v. Macklowe*, 99 A.D.3d

595, 596, 953 N.Y.S.2d 21, 23 (1st Dep't 2012)); *see also Mastrovincenzo v. City of*

*N.Y.*, 435 F.3d 78, 104 (2d Cir. 2006) (when interpreting contracts under New York

law, "words should be given the meanings ordinarily ascribed to them and absurd

results should be avoided") (cleaned up).

"Where the parties dispute the meaning of particular contract clauses, the

task of the court is to determine whether such clauses are ambiguous when read in

the context of the entire agreement."  *32BJ N. Pension Fund v. Nutrition Mgmt.*

*Servs. Co.*, 935 F.3d 93, 100 (2d Cir. 2019) (citation omitted).  No ambiguity exists

where "the contract language has a definite and precise meaning . . . concerning

which there is no reasonable basis for a difference in opinion."  *Law Debenture Tr.*

*Co. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (citation omitted).

Conversely, an ambiguity exists where the contract terms "could suggest more than

one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* at 466 (citation omitted). "The matter of whether the contract is ambiguous is a question of law for the court." *Id.* at 465.

"For a defendant to prevail on a motion to dismiss for breach of contract, the contract must unambiguously support the defendant's position." *Trireme Energy Dev., LLC v. RWE Renewables Ams., LLC*, No. 22 Civ. 7439 (JLR), 2023 WL 5469662, at \*12 (S.D.N.Y. Aug. 24, 2023). While courts "are not obliged to accept the allegations of the complaint as to how to construe a contract," they "should resolve any contractual ambiguities in favor of the plaintiff on a motion to dismiss." *Id.* (citations omitted). "[I]f a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004).

## DISCUSSION

To state a claim for breach of contract under New York law, "a plaintiff must allege '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" *Meng v. New School*, 686 F. Supp. 3d 312, 316-17 (S.D.N.Y. 2023) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)). Here, TOI does not dispute that PFL has adequately alleged the first three elements of a breach of contract claim. The sole

issue is whether PFL has adequately alleged the element of damages in view of the limitation of liability provision in Section 13.c of the Agreement.

Relying on what it describes as "the unambiguous language of the Agreement," TOI argues that Section 13.c "expressly bars" any recovery by PFL for an action sounding in breach of contract. (TOI Br. at 6). As an initial matter, even viewing Section 13.c in isolation, TOI's argument goes too far. Section 13.c does not purport to absolve the parties from *any* liability for breach of contract, but instead *limits* liability to "the amount of the fee actually paid by [TOI] to PFL for the year of the term during which the claim arose." (Dkt. No. 16-1 at 6). Here, TOI had paid $208,500 in fees to PFL in 2022 prior to its breach. (SAC ¶ 12). Therefore, Section 13.c, if construed favorably to TOI, still would require TOI to pay PFL at least $208,500 based on TOI's breach of contract. For this reason alone, TOI's motion to dismiss the SAC altogether would have to be denied.

Given the centrality of Section 13.c to the parties' dispute, the Court's analysis does not stop there. The Court proceeds to examine whether PFL's claim for nonpayment of the Sponsorship Fee does (as TOI contends) or does not (as PFL contends) fall within the scope of that clause—even if the effect of a ruling in TOI's favor would be to limit PFL's damages to $208,500 rather than to bar recovery entirely. To be sure, the provision's plain meaning weighs in favor of TOI: on its face, Section 13.c's liability cap applies to *any* breach of contract claim asserted by *either* party. (*See* Dkt. No. 16-1 at 6). Read literally and in isolation—as PFL

CASE 1:24-cv-01335-GS   Document 30   Filed 03/17/25   Page 10 of 19

tacitly concedes—the language of Section 13.c thus would appear to encompass an action by PFL for nonpayment of the Sponsorship Fee.

Under well-settled principles of New York law, however, the Court's inquiry cannot be so narrow. "Because contract interpretation is an exercise in 'common sense' rather than 'formalistic literalism,' 'words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.'" *RCJV Holdings, Inc. v. Collado Ryerson, S.D. de C.V.*, 18 F. Supp. 3d 534, 545 (S.D.N.Y. 2014) (quoting *Duane Reade, Inc. v. Cardtronics, LP*, 54 A.D.3d 137, 143-44, 863 N.Y.S.2d 14, 19 (1st Dep't 2008)). "The Court therefore need not follow the literal meaning of the language used if doing so would, based on the structure and purpose of the agreement, produce a result that is 'absurd, commercially unreasonable, or contrary to the reasonable expectation of the parties.'" *Trireme Energy Dev., LLC v. RWE Renewables Ams., LLC*, No. 22 Civ. 7439 (JLR), 2024 WL 4825975, at *30 (S.D.N.Y. Nov. 19, 2024) (quoting *RCJV Holdings*, 18 F. Supp. 3d at 545). As Justice Cardozo instructed long ago: "If literalness is sheer absurdity, we are to seek some other meaning whereby reason will be instilled and absurdity avoided." *Outlet Embroidery Co. v. Derwent Mills, Ltd.*, 254 N.Y. 179, 183, 172 N.E. 462, 463 (1930); *see also Beanstalk Grp., Inc. v. AM Gen. Corp.*, 283 F.3d 856, 860 (7th Cir. 2002) (Posner, J.) ("[A] contract will not be interpreted literally if doing so would produce absurd results, in the sense of results that the parties, presumed to be rational persons pursuing rational ends, are very unlikely to have agreed to seek.").

This is precisely the argument that PFL makes in opposing TOI's motion to dismiss: that it would be "absurd" to construe Section 13.c as limiting its claim for nonpayment of the Sponsorship Fee. (PFL Br. at 4-6). That type of argument is, as a general matter, difficult to win. The New York Court of Appeals "'has set a high bar for declaring a contract absurd.'" *Cottam v. Glob. Emerging Cap. Grp., LLC*, No. 16 Civ. 4584 (LGS), 2020 WL 1528526, at \*6 (S.D.N.Y. Mar. 30, 2020) (quoting *Warberg Opportunistic Trading Fund, L.P. v. GeoResources, Inc.*, 112 A.D.3d 78, 83, 973 N.Y.S.2d 187, 192 (1st Dep't 2013)). "Courts in this District have summarized New York law as holding that 'only contracts that very nearly produce the opposite effect of what the parties likely desired will be held to be absurd.'" *Brunckhorst v. Bischoff*, No. 21 Civ. 4362 (JPC), 2024 WL 4277788, at \*14 (S.D.N.Y. Sept. 24, 2024) (quoting *Wiseman v. ING Groep, N.V.*, No. 16 Civ. 7587 (AJN), 2017 WL 4712417, at \*6 (S.D.N.Y. Sept. 28, 2017)). Nonetheless, having considered Section 13.c in the context of the Agreement's other provisions, structure, and purpose, and the relevant case law, the Court concludes that, at least at the pleading stage, this is one of the relatively rare cases where the absurd results doctrine may apply.

The Agreement delineates TOI's payment obligations in clear and unequivocal terms: "SPONSOR *shall pay* PFL a sponsorship and marketing fee . . ., in consideration of the Benefits," on the specific dates and amounts set forth in the schedule of payments. (Dkt. No. 16-1 at 1 (emphasis added)). Yet under TOI's reading of Section 13.c, these mandatory, fixed, and definite payment obligations would be rendered illusory. As noted, Section 13.c, where it applies, limits a party's

liability "to the amount of the fee actually paid by [TOI] to PFL for the year of the term during which the claim arose." (*Id.* at 6).  If Section 13.c applies to TOI's payment obligations, this would mean that, if TOI failed to make a payment in a year in which it had not already made any payment, PFL would have no remedy for TOI's breach—for, in that circumstance, "the amount of the fee actually paid" during the year would be zero.  Even if TOI had made a payment during the year in question, if it then welched on other payments due that year in an amount in excess of what it had already paid, PFL similarly would have no remedy for that breach.

In other words, under its interpretation, TOI could breach its payment obligations with impunity.  PFL thus would be deprived of the very fruits of the contract it bargained for: the fee to which it was entitled in exchange for providing promotional and sponsorship benefits to TOI.  That result can assuredly be described as absurd and the very opposite of what the parties likely intended.  "It would be an absurd result to interpret the contract in a manner that leaves one party without a remedy in the event of a breach by the other." *Southridge Partners II Ltd. P'ship v. PotNetwork Holdings, Inc.*, 3:17-cv-1925 (KAD), 2019 WL 2248691, at *5 (D. Conn. May 24, 2019); *see also Samba Enterps., LLC v. iMesh, Inc.*, No. 06 Civ. 7660 (DC), 2009 WL 705537, at *11 (S.D.N.Y. Mar. 19, 2009) (applying absurd results doctrine where it would "make no sense for [plaintiff] to have signed the Agreement if it thought [defendant] would be able to reap the benefits of [plaintiff's] efforts . . . without compensating [plaintiff]"); *Cole v. Macklowe*, 99 A.D.3d 595, 596, 953 N.Y.S.2d 21, 23 (1st Dep't 2012) ("the interpretation of the agreement urged by

defendants—allowing them to acquire plaintiff's partnership interest absent the

consideration expressed in the agreement—represents a windfall to the defendants

that is absurd, not commercially reasonable and contrary to the express terms of

the agreement and thus the intent of the parties"); *ERC 16W Ltd. P'ship v. Xanadu*

*Mezz Holdings LLC*, 95 A.D.3d 498, 503, 943 N.Y.S.2d 493, 498 (1st Dep't 2012) ("It

is a longstanding principle of New York law that a construction of a contract that

would give one party an unfair and unreasonable advantage over the other, or that

would place one party at the mercy of the other, should, if at all possible, be

avoided.").

    That the extent of TOI's liability for nonpayment would depend on the

amount of its prior payments highlights the seeming absurdity of reading Section

13.c literally.  Under a literal reading, if TOI had paid PFL only $108,500 in 2022

rather than $208,500, PFL would only be able to recover $108,500 of the unpaid

amount rather than $208,500.  In other words, the *greater* TOI's breach, the *less*

damages PFL would be entitled to.  *See Aviation Fin. Co. v. Chaput*, No. 14 Civ.

8313 (CM), 2015 WL 13203653, at \*9 (S.D.N.Y. Mar. 12, 2015) (noting "the settled

maxim of contract construction that forbids giving a contract a nonsensical

interpretation").

    Courts in this District have not hesitated to reject literal interpretations of

contract clauses that produce results as absurd and commercially unreasonable as

PFL alleges is the case here.  In the absence of language in the contract expressly

compelling such a result, courts have reasoned that the contract may be read to

exclude the absurd result from the scope of the clause and is, in that sense, ambiguous, warranting consideration of extrinsic evidence. *See, e.g.*, *Trireme*, 2024 WL 4825975, at \*28-36; *RCJV Holdings*, 18 F. Supp. 3d at 543-48.[3]

In *Trireme*, for example, the court considered a contractual provision in a merger agreement prohibiting the purchaser from transferring its development projects; the seller claimed this provision unambiguously applied to *all* transfers, including internal reorganizations. *Trireme*, 2024 WL 4825975, at \*6, 28. Because the provision itself "[did] not clarify" to whom the purchaser was prohibited from transferring development projects, the court looked to "the purpose and context of the Merger Agreement," which suggested that "the parties did not intend [the provision] to apply so broadly as to restrict even intracorporate restructurings." *Id.* at \*30. Although the seller's reading of the provision was "arguably more faithful to the plain text," the court found, "its application to the present circumstances strains commercial reasonableness and common sense." *Id.* at \*31 (citation omitted). As a result, the court concluded, "the provision is ambiguous," requiring recourse to

---

[3] "[C]ontractual ambiguities come in two forms—patent and latent." *Ezrasons Inc. v. Travelers Indem. Co.*, 89 F.4th 388, 395 (2d Cir. 2023). A patent ambiguity "appears on the face of the instrument," whereas latent ambiguities "occur when, although the words of the contract appear on their face to have a clear meaning, the evidence shows that they could apply to different facts, objects, or circumstances." *Id.* (citation omitted); *see also Morgan Stanley Grp Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 276 (2d Cir. 2000) ("[A] contract may be ambiguous when applied to one set of facts but not another."). Although "[i]t is not always easy to distinguish between patent ambiguity and latent ambiguity," *Ezrasons*, 89 F.4th at 398, some courts have analyzed situations where application of contractual terms would produce an absurd result as a form of latent ambiguity. *See, e.g.*, *Branch Banking & Tr. Co. v. Angino Law Firm, P.C.*, No. 1:16-CV-712, 2018 WL 4404627, at \*7 (M.D. Pa. Sept. 17, 2018) (stating that "a litigant may establish latent ambiguity" by, *inter alia*, "demonstrating that a plain reading of the contract's written terms compels an absurd and unreasonable result"); *In re Idleaire Tech. Corp.*, Bankr. No. 08-10960 (KG), 2009 WL 413117, at \*8 (Bankr. D. Del. Feb. 18, 2009) (stating that "[t]he plain language of an insurance policy . . . can be ambiguous, even when there is only one reasonable interpretation of the language, when a plain meaning reading can lead to an absurd result" and describing this as a form of "latent ambiguity").

"extrinsic evidence of the parties' intent." *Id.*; *see also RCJV Holdings*, 18 F. Supp. 3d at 546 (similarly concluding that, while defendant's interpretation of contract language "is more faithful to the plain text," plaintiff's interpretation "is more commercially reasonable" and that, under these circumstances, the provision "is ambiguous").[4]

Likewise, Section 13.c here does not expressly state that the liability cap applies to TOI's obligation to pay the contractually required Sponsorship Fee. Construing it to apply in that circumstance would be inconsistent with the structure, context and purpose of the Agreement as a whole and, in particular, with TOI's mandatory payment obligations. Nor would it appear to fulfill the purpose of Section 13.c itself. "Contractual limitations of liability are intended to protect the wrongdoer defendant from unlimited liability," *Rose Leaf Cleaning, Inc. v. Sonder Hospitality USA, Inc.*, No. 22 Civ. 7462 (JHR), 2024 WL 3937600, at *8 (S.D.N.Y. Aug. 26, 2024) (citation omitted), but TOI's payment obligations are fixed and definite, not open-ended. Accordingly, while TOI's interpretation may be "more faithful to the plain text" of Section 13.c, it "strains commercial reasonableness and

---

[4] By contrast, courts that have rejected an absurdity argument have done so because there was a plausible reason to believe the plain meaning of the contract is what the parties intended. *See, e.g.*, *Brunckhorst*, 2024 WL 4277788, at *14 (declining to find hypothetical absurd where it "would not obviously contradict the goals of the Shareholder's Agreement"); *Wiseman*, 2017 WL 4712417, at *6 (high bar for absurdity not met where "it is to be expected that an insurer would not make itself beholden to offer policies to any person regardless of age and risk factors"); *Warberg*, 973 N.Y.S.2d at 192 (contractual language not absurd because "[i]t is possible that [defendant] used boilerplate language in its warrants" and the parties "may very well have assented to the agreement on those terms"). TOI proffers no plausible reason here for why the parties would have intended for Section 13.c to allow TOI to escape its payment obligations.

common sense," rendering the scope of the limitation of liability provision

ambiguous.  *Trireme*, 2024 WL 4825975, at \*31.

Decisions from other jurisdictions, involving limitation of liability provisions

specifically, lend further support to this conclusion.  The court in *Tibco Software*

*Inc. v. Mediamath, Inc.*, C.A. No. N18C-07-066CLS, 2019 WL 3034781 (Del. Super.

Ct. July 10, 2019), was confronted with a virtually identical situation.  There, as

here, the defendant breached a contract by failing to pay the plaintiff for services

rendered.  *Id.* at \*1.  As here, the defendant argued that a limitation of liability

clause in the contract capped its liability at zero dollars.  *Id.*  Similar to Section

13.c, the clause provided that "neither party's aggregate liability arising out of or

related to this agreement (whether through indemnification, in contract, tort or

otherwise) will exceed the actual amount paid by [defendant] within the 12 months

preceding the event that gave rise to liability."  *Id.*  The court denied the

defendant's motion for judgment on the pleadings, reasoning as follows:

> The Court finds [defendant's] proffered interpretation unreasonable.
> Despite admitting that it has not paid the $321,187.46 owed under the
> Invoice, [defendant] asks the Court to construe the [limitation of
> liability] provision as limiting [plaintiff's] recovery to zero dollars.
> Surely no reasonable party would conclude that a failure to pay fees
> owed under an enforceable contract can be the same basis used to
> avoid responsibility for the same fees. . . . To find otherwise would
> produce an absurd result.

*Id.* at \*3; *see also Callisto Corp. v. Inter-State Studio & Pub. Co.*,

No. 05-11953-GAO, 2006 WL 1240711, at \*2 (D. Mass. May 4, 2006) (denying

motion for judgment on the pleadings based on defendant's broad reading of

limitation of liability clause: "While there may be no perfect interpretation of the

16

limitation of liability provision drafted by the parties, it is my duty to construe it in a common sense fashion that produces the most plausible or rational result when considering the Agreement as a whole. . . . I therefore conclude that the phrase 'loss of revenue or profit' as used in the limitation of liability clause refers to revenues and losses in a consequential sense and does not encompass the royalty payments which are the fruit of the Agreement.").

In addition to Section 13.c, TOI relies on the Agreement's integration clause, which states that the Agreement "sets forth the entire understanding of SPONSOR and PFL with respect to the subject matter hereof." (TOI Br. at 4-5 (quoting Dkt. No. 16-1 at 7)). But the integration clause is immaterial to the issue of contract interpretation raised by TOI's motion. PFL does not rely on any alleged oral promise or understanding outside of the terms of the Agreement. A contract with an integration clause, no less than a contract without such a clause, can contain terms that are ambiguous and need to be interpreted in light of extrinsic evidence. *See Trireme*, 2024 WL 4825975, at *33 ("Nor does the Merger Agreement's integration clause bar consideration of the parties' contemporaneous transaction documents. The Court has already deemed the contract ambiguous; therefore, extrinsic evidence may be considered."); *Storwal Int'l, Inc. v. Thom Rock Realty Co.*, 768 F. Supp. 429, 431 (S.D.N.Y. 1991) ("If . . . a contract with an integration clause is susceptible of at least two interpretations, a court can consider extrinsic evidence not to prove different or additional terms, but to aid in interpreting ambiguous terms of such a contract.").

Accordingly, for purposes of this motion to dismiss, the Court rejects TOI's

argument that Section 13.c must be read literally and that the Agreement is

unambiguous.  At the pleading stage, PFL has cleared the "high bar," *Cottam*, 2020

WL 1528526, at *6, for deeming that reading absurd.  The SAC thus adequately

alleges the element of damages, in addition to the other required elements (the

existence of a binding agreement, performance by PFL, and breach by TOI).  It

follows that PFL has stated a valid claim for breach of contract.

That said, the Court does not on this motion adopt PFL's interpretation of the

Agreement.  Rather, it holds merely that PFL's interpretation is sufficiently

plausible to render the Agreement ambiguous and mandate denial of TOI's motion

to dismiss the SAC as a matter of law.  Extrinsic evidence could show that the

parties in fact intended Section 13.c to apply to TOI's nonpayment of the

Sponsorship Fee (however unlikely that may be).  *See Beanstalk*, 283 F.3d at 860

("'[P]arties *can* contract for preposterous terms. If contract language is crystal clear

or there is independent extrinsic evidence that something silly was actually

intended, a party may be held to its bargain, absent some specialized defense.'")

(quoting *Rhode Island Charities Tr. v. Engelhard Corp.*, 267 F.3d 3, 7 (1st Cir. 2001)

(emphasis in original)).  It appears that PFL could have terminated the Agreement

upon TOI's breach (*see* Dkt. No. 16-1 at 4), and it is unclear at this point in the

litigation why, for nearly two years after TOI stopped making payments, PFL did

not terminate the Agreement and instead continued to perform its end of the

bargain by providing promotional and sponsorship benefits to TOI.  The answer to

18

that question may (or may not) bear upon the commercial reasonableness of applying Section 13.c to limit PFL's recovery of damages for TOI's breach.

Thus, a definitive resolution of the parties' dispute over the applicability of Section 13.c must await the outcome of discovery. For now, it is sufficient to say that the Agreement "is ambiguous as applied" to PFL's remedies in the event of a breach of TOI's payment obligations and, consequently, the Court "has insufficient data to dismiss [the SAC] for failure to state a claim." *Eternity Glob. Master Fund*, 375 F.3d at 178.

## CONCLUSION

For the reasons set forth above, TOI's motion to dismiss the SAC is **DENIED**. The Clerk of Court is respectfully requested to terminate the pending motion at Dkt. No. 15. TOI is directed to file its Answer to the SAC within 14 days of the date of this Opinion & Order.

**SO ORDERED.**

DATED:     New York, New York
           March 17, 2025

_____
GARY STEIN
United States Magistrate Judge